UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| MK2 WHOLESALE, LLC, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | No. 3:21-cv-759 |
| DIBAR LABS, LLC, ORANGES TO DOLLARS ENTERPRISES INC., and GPP MARKETING GROUP, LLC, | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

With the advent of COVID-19, Americans became quite familiar with hand sanitizers, Frank Brinkman perhaps more than most. According to him, his company, MK2 Wholesale, LLC of College Grove, Tennessee, was left holding the bag when approximately half-a-million dollars worth of hand sanitizer was recalled because it contained methanol, making it unsafe for use. MK2 was also out more than twenty grand in shipping costs. As a result, MK2 filed suit against the manufacturer of the product, DiBar Labs, LLC, a Texas company with a principal place of business in Sugarland, Texas; GPP Marketing Group out of Overland Park, Kansas, the exclusive marketing representative of DiBar; and Oranges to Dollars, a Florida company based in Jacksonville, that sourced the hand sanitizer from GPP.

DiBar has yet to be served with process, but both Dollars to Oranges (Doc. No. 12) and GPP (Doc. No. 23) have filed motions to dismiss for lack of personal jurisdiction. The motions and arguments are virtually identical. (Doc. Nos. 13, 16, 22, 24, 26). The Court will deny both motions because plaintiff's "burden is 'relatively slight' where, as here, the district court rules without conducting an evidentiary hearing," and "t[o] defeat dismissal in this context, plaintiffs need make

only a prima facie showing that personal jurisdiction exists." Anwar v. Dow Chem. Co., 876 F.3d 841, 847 (6th Cir. 2017).

## I.

According to Brinkman, MK2's trouble began in April 2020 when he was introduced to Greg Stanbury, the President of Dollars to Oranges, who expressed an interest in selling goods to MK2. (Doc. No. 26-1, Brinkman Decl. ¶ 5). Stanbury also introduced Brinkman to John Anastio, the Chief Executive Officer of GPP Marketing because it "was the sole avenue by which to make a wholesale purchase of the hand sanitizer produced by DiBar Labs." (Id. ¶ 7) Thereafter, from his office in Tennessee, Brinkman exchanged several emails and telephone calls with Stanbury about MK2 purchasing hand sanitizers for resale to its grocery store clients. (Id. ¶ 6).

On April 9, 2020, MK2 submitted to Stanbury and Dollars to Oranges a purchase order for 1,540 cases of DiBar Labs Hand Sanitizer Gel at the price of $108.00 per case for a total of $166,320. The purchase order was captioned with a semi-truck logo and the name "MK2 Wholesale, LLC, 6752 Falls Ridge Lane, College Grove, Tennessee." (Doc. No. 16-1, Ex. 1). The purchase order also allocated $2,200 for freight, with an expected receipt date of April 21, 2020. (Id.). The following day, Oranges to Dollars issued an invoice to MK2, identifying the salesperson as "Greg" and stating that MK2 had issued a purchase order for 73,920 eight ounce bottles of DiBar Labs hand sanitizer gel at a unit price of $2.25, totaling $166, 320. (Id. Ex. 2). The invoice also reflected that MK2 had deposited with Dollars to Oranges almost half that amount. (Id.).

In May 2020, MK2 placed additional orders with Oranges to Dollars for hand sanitizers. Each order began with a purchase order from MK2 that was sent to Oranges to Dollars, and a return invoice was provided to MK2 from Oranges to Dollars. (Brinkman Decl. ¶¶ 10-11, 13). Both the

purchase order and the wire transfers for payment were generated by Brinkman from his office in Tennessee. (Id. ¶¶ 13-14).

In his declaration, Brinkman avers that he was told by Stanbury that both MK2's purchase orders and Oranges to Dollars' invoices were shared with Anastio "in order to effectuate the hand sanitizer sale[s]." (Id. ¶ 11). Brinkman also claims that he had several phone calls with Anastio before and after MK2 and Brinkman placed or received those phone calls from his office in Tennessee. (Id. ¶ 12)

On August 12, 2020, Stanbury emailed Brinkman a copy of an advertisement that was placed on Linkedin, with the notation "please get this out to your buyers and lets [sic] do some business." (Doc. No. 16-1, Ex. 3). The ad displayed several bottles of DiBar Hand Sanitizer next to the statements: "Our products are safe to use"; "all raw materials are lab analyzed"; "formula at 70% alcohol concentration; and "manufactured at an FDA compliant facility." (Id.) (emphasis in original).

On May 18, 2021, DiBar issued a voluntary recall that applied to all the hand sanitizer purchased by MK2. (Doc. No. 1, Complaint ¶14). By then, however, MK2 had sold the hand sanitizer to two of its clients. Those clients were grocery store chains with locations in 6 states, and they removed the sanitzer from their inventory. (Id. ¶ 15). DiBar offered a replacement hand sanitizer but MK2's clients did not want to receive goods from DiBar. As a consequence, MK2 opted to revoke acceptance of the recalled hand sanitizer. (Id. ¶ 16).

MK2 contends that even though it complied with GPP's request for an accounting relating to unsold hand sanitizer, both DiBar and GPP failed to issue a refund or arrange for its collection. (Id. ¶¶ 17, 18). MK2 further alleges that its clients paid MK2 $480,586.20 for the hand sanitizer

and MK2 spent an additional $22,217.24 in transporting, storing, testing, and recalling the hand sanitizer. (Id. ¶¶ 19, 20).

MK2's Complaint is in three counts. Count I alleges breach of contract against Oranges to Dollars. Counts II and III are against DiBar and GPP Marketing and allege breach of implied warranty of merchantability and unjust enrichment, respectively.

In their Motions to Dismiss, Oranges to Dollars and GPP Marketing take little issue with the allegations in the Complaint or the assertions made by Brinkman in his declaration. Instead, they have each submitted declaration in an effort to distance themselves from Tennessee.

In an affidavit submitted on behalf Oranges to Dollars, Stanbury states that his company does not conduct any business, sell any goods, perform any work, provide any service, or advertise in Tennessee, nor has it ever been authorized, registered or licensed to do business or had an agent for service of process in Tennessee. (Doc. No. 13-1, Stanbury Aff. ¶ 3-5, 7, 9). Additionally, none of its employees has ever traveled to this state to conduct business, nor has Oranges to Dollars ever owned, used or lease property in Tennessee. (Id. ¶¶ 6, 8). As for its particular dealings with MK2, Stanbury claims that it was unaware of the location of the customers to whom MK2 sold the hand sanitzer until discussions regarding the recall began. (Id. ¶ 10). On this point, Stanbury notes that the goods were not tendered in Tennessee, but instead were picked up by MK2 or its agent in El Paso, Texas. (Id. ¶ 11). Anastio avers the exact same things in the same order in the affidavit he filed on behalf of GPP Marketing. (Doc. No. 24-1, Anastio Decl. ¶¶ 3-11).

## II.

"Personal jurisdiction may be found either generally or specifically." Miller v. AXA Winterthur Ins. Co., 694 F.3d 675, 678 (6th Cir. 2012) (quoting Air Prods. & Controls, Inc. v.

4

Safetech Int'l, Inc., 503 F.3d 544, 549-50 (6th Cir. 2007)). "General jurisdiction depends on continuous and systematic contact with the forum state, so that the courts may exercise jurisdiction over any claims a plaintiff may bring against the defendant." Kerry Steel, Inc. v. Paragon Indus., Inc., 106 F.3d 147,149 (6th Cir. 1997). Specific jurisdiction, on the other hand, deals with a defendant's contacts with the forum state relating to the claims at issue. AlixPartners. LLP v. Brewington, 836 F.3d 543, 549-50 (6th Cir. 2016).

In the absence of evidence to the contrary, the declarations filed by Stanbury and Anastio establish without question the lack of general jurisdiction over either Dollars-to-Oranges or GPP Marketing. After all, general jurisdiction can be found to exist only where the foreign defendant is "essentially at home in the forum State," Goodyear Dunlop Tires Operations, S.A. v. Brown, 131 S. Ct. 2846 (2011), with "the place of incorporation and principal place of business being [the] 'paradig[m] . . . bases for general jurisdiction,'" Daimler AG v. Bauman, 134 S. Ct. 746, 760 (2014) (citation omitted). MK2 does not argue otherwise. The issue of personal jurisdiction, however, presents a closer question.

"In a diversity case, a plaintiff must satisfy the state-law requirements for personal jurisdiction." Schneider v. Hardesty, 669 F.3d 693, 699 (6th Cir. 2012) (citing Estate of Thomson ex rel. Estate of Rakestraw v. Toyota Motor Corp. Worldwide, 545 F.3d 357, 361 (6th Cir.2008)). "The authority of a Tennessee court to exercise personal jurisdiction over a nonresident defendant is first defined by statute," and that statute – Tenn. Code Ann. § 20-2-214(a)(5), (6) – "expand[s] the jurisdictional reach of Tennessee courts as far as constitutionally permissible" within the confines "set by the Due Process Clause of the Fourteenth Amendment to the United States Constitution." Crouch Ry. Consulting, LLC v. LS Energy Fabrication, LLC, 610 S.W.3d 460, 471 (Tenn. 2020).

The Due Process Clause is satisfied where the defendant purposefully availed itself of the privilege of acting in the forum state, the cause of action arose from the defendant's actions in the forum state and the defendant's acts or consequence have a substantial enough connection with the forum state so as to make the exercise of jurisdiction reasonable. MAG IAS Holdings, Inc. v. Schmuckle, 854 F.3d 894, 900 (6th Cir. 2017); Miller, 694 F.3d at 680. "Purposeful availment" ensures that a defendant is not brought into a foreign court "solely as a result of random, fortuitous or attenuated contacts," Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985), such that the defendant "should reasonably anticipate being haled into court there," World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980).

In their respective briefs, the parties paint the personal jurisdiction issue with the broadest of strokes. Dollars to Oranges and GPP Marketing essentially argue that the hand sanitizer deal was a one-off involving Kansas and Florida companies that agreed to sell items to a company that just happened to be located in Tennessee. With the same broad brush, MK2 argue that it was the one that was approached, that there were several sales involving hand sanitizer, and that numerous emails and telephone calls were received from, and placed in, Tennessee regarding those sales. Answering the personal jurisdiction question requires a miniaturist, not a landscapist, however.

"The canonical decision in this area remains International Shoe Co. v. Washington, 326 U.S. 310 (1945)" where the Supreme Court held that a defendant's contacts with the forum state must be such that "the maintenance of the suit is reasonable, in the context of our federal system of government, and does not offend traditional notions of fair play and substantial justice." Ford Motor Co. v. Montana Eighth Jud. Dist. Ct., 141 S. Ct. 1017, 1024 (2021) (citation omitted). "[T]his determination is one in which few answers will be written 'in black and white. The greys are

6

dominant and even among them the shades are innumerable.' " Kulko v. Superior Ct. of California, 436 U.S. 84, 92 (1978) (quoting Estin v. Estin, 334 U.S. 541, 545 (1948)). "Moreover, in contract cases in particular, the validity of the exercise of personal jurisdiction over a nonresident defendant has often fit squarely within the grey area," and "a court must dig deeper[.]" Crouch, 610 S.W3d at 474, 476.

This Court cannot make that dig without shovels being provided by the parties, and whether MK2 will have a tough row to hoe in establishing personal jurisdiction remains to be seen. See MAG IAS Holdings, 854 F.3d at 899 ("When a prima facie showing is made, . . . the defendant can continue to contest personal jurisdiction by requesting an evidentiary hearing or moving for summary judgment should the evidence suggest 'a material variance from the facts' as presented by plaintiffs"). At this point, however, MK2 has uncovered enough fertile ground to survive dismissal because (1) "prior negotiations," "contemplated future contracts," and "the actual course of dealing" may be sufficient for a contract to provide personal jurisdiction, Burger King, 471 U.S. at 479, and (2) "the notion that a defendant, in an appropriate case, may be subject to personal jurisdiction without physically having entered the forum is by now 'an unexceptional proposition,'" Crouch, 610 S.W.3d at 478 (citation omitted).

## III.

From the Complaint, the Court cannot tell exactly how much is at stake. The half-a-million dollar figure is the amount MK2 was paid by its clients, not the amount it paid Defendants. Moreover, it appears that approximately a year passed between the time that MK2 placed its first order and the time that DiBar issued a voluntary recall, suggesting that some hand sanitizer had been sold and used. Similarly, the Court does not know each of the Defendant's positions as to the

7

allegations made in the Complaint, although it would appear that – to a greater or lesser extent – each played a role in supplying MK2 with hand sanitizer that was ultimately recalled.

The Court makes the forgoing observations because discovery (including jurisdictional discovery) can become very expensive, quite quickly. Under the Referral Order in this case, as in all other civil cases, the parties are required to "include a plan for resolution of the case that includes at least two independent attempts to resolve the case that must be approved by the Magistrate Judge." (Doc. No. 7 at 1). From what the Court can gather thus far, prudence dictates that the first good faith attempt at settlement should occur sooner, rather than later.

Accordingly, the Motions to Dismiss (Doc. Nos. 12, 23) are **DENIED.** This case is returned to Magistrate Judge Frensley for further pretrial management, including a discussion with the parties about attempting to settle this case early-on in the proceedings.

IT IS SO ORDERED.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE